**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Katherine Muirhead and Cameron Muirhead as next best friends of J.M, a minor, | ) ) ) | |
| *Plaintiffs,* | ) ) | No. 26-cv-7990 |
| v. | ) ) | Judge |
| Christine DeGrange, Lisa Carswell, Delores Jones, and Kenneth Leggin, | ) ) ) | |
| *Defendants.* | ) ) | |

**COMPLAINT AND JURY DEMAND**

NOW COME Plaintiffs, KATHERINE MUIRHEAD and CAMERON MUIRHEAD (collectively "Plaintiffs"), as next best friends of J.M., a minor, by and through their attorneys, Themis: Trial by Women of Hale Law LLC (f/k/a Hale & Monico, LLC), and, complaining of Defendants CHRISTINE LEGRANGE, LISA CARSWELL, DELORES JONES, and KENNETH LEGGIN (collectively "DEFENDANTS"), state as follows:

1.      Plaintiff J.M., a minor ("J.M."), at all material and relevant times was and is a resident of Cook County, Illinois.

2.      Plaintiff KATHERINE MUIRHEAD ("KATHERINE") at all material and relevant times, has and had legal custody of J.M., and was and is a resident of Cook County, Illinois.

3.      Plaintiff CAMERON MUIRHEAD ("CAMERON"), at all material and relevant times, has and had legal custody of J.M., and was and is a resident of Cook County, Illinois.

4.      On information and belief, at all material and relevant times hereto, Defendant CHRISTINE DEGRANGE ("DEGRANGE") was a professional child welfare social worker and

1

a Child Protection Specialist employed by the State of Illinois Department of Children and Family Services ("DCFS").

5. On information and belief, at all material and relevant times hereto, Defendant LISA CARSWELL ("CARSWELL") was a professional child welfare social worker and a Public Service Administrator employed by DCFS.

6. On information and belief, at all material and relevant times hereto, Defendant DELORES JONES ("JONES") was a professional child welfare social worker and a Public Service Administrator employed by DCFS.

7. On information and belief, at all material and relevant times hereto, Defendant KENNETH LEGGIN ("LEGGIN") was a professional child welfare social worker and a Senior Public Service Administrator employed by DCFS.

## JURISDICTION AND VENUE

8. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of law, of Plaintiffs' KATHERINE MUIRHEAD and CAMERON MUIRHEAD, as next best friends of J.M., a minor, rights as secured by the Constitution of the United States.

9. This Court has jurisdiction over this matter's federal claims pursuant to 28 U.S.C. § 1331, and the state law claims pursuant to 28 U.S.C. § 1367.

10. The events giving rise to the claims asserted in this Complaint occurred within this District. Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

## BACKGROUND

*J.M., KATHERINE AND CAMERON are*
*Connected Via Safe Families*

11. Safe Families for Children ("Safe Families") was established in Chicago, Illinois in 2003.

2

12. Safe Families was "born out of the need to keep children safe," and to provide family-like relationships around isolated parents to prevent the need for child removal or family separation.

13. Specifically, Safe Families is a program through which volunteer individuals and/or families open their homes to other families and/or parents and children experiencing crisis, alongside social isolation, with no family or friends to whom they can turn.

14. J.M. was born on October 2, 2020, to his biological mother ("J.M.'s mother"), a single parent. J.M. was his mother's only child. No father was or is identified on his birth certificate and no Voluntary Acknowledgement of Paternity ("VAP") was ever executed on his behalf. In fact, J.M.'s mother was unsure of the identity of J.M.'s biological father.

15. J.M. was born with a rare neurological condition, which requires daily administration of medication.

16. At the time of J.M.'s birth and through April 2023, at which time J.M.'s mother tragically died, J.M.'s mother also suffered from a number of medical conditions that required daily medications, in addition to requiring inpatient medical care and treatment at facilities away from her young child. Between both J.M.'s and J.M.'s mother's respective medical conditions and needs, in addition to having little to no assistance from family and friends, they were identified as a family in crisis that could benefit from enrollment in Safe Families.

17. In December 2020, Plaintiffs were approved through Safe Families to begin serving as host parents to families in need.

18. In January 2021, through Safe Families, Plaintiffs were connected with and introduced to J.M.'s mother.

19. Throughout 2021 up to J.M.'s mother's untimely and tragic death in April 2023,

J.M.'s mother signed parental consents for her and Plaintiffs to participate in Safe Families, including signing consents for the appointment of Short-Term Legal Guardianship and Power of Attorney for Health Care of a Minor Dependent ("Parental Consents"). These Parental Consents granted Plaintiffs guardianship over J.M., allowing J.M. to be kept in their custody and under their care on the weekends and whenever J.M.'s mother requested help.

20. At the time of J.M.'s mother's death, she had executed a Parental Consent appointing Plaintiffs short-term guardians for J.M. through January 2024.

21. In 2021, J.M. spent a total of 155 days with Plaintiffs in their home and custody, and under their care.

22. In 2022, J.M. spent 150 days with Plaintiffs in their home and custody, and under their care.

23. From January 2023 until May 2, 2023, J.M. spent 57 days with Plaintiffs in their home and custody, and under their care.

*J.M. Is Forcibly Removed from Plaintiffs' Custody and Home, and Placed With a Stranger*

24. In April 2023, after Plaintiffs had made numerous failed attempts to contact and speak with J.M.'s mother, she was discovered dead in her home. Then-two-year-old J.M. was discovered alone with his deceased mother.

25. At the time when J.M.'s mother's body was discovered, J.M. had been alone with her body for approximately seven (7) days. Miraculously, he had managed to survive.

26. Plaintiffs received custody of J.M. almost immediately following the discovery of J.M.'s mother's death. J.M. remained in their home and custody, and under their care, until May 2, 2023.

27. During J.M.'s mother's life, she served as J.M.'s primary caregiver.

28.     Upon J.M.'s mother's death, Plaintiffs assumed the roles as J.M.'s caregivers.

29.     Late in the evening on May 2, 2023, without notice or warning, Defendant DEGRANGE came to Plaintiffs' home and forcibly took J.M. from them.

30.     DEGRANGE did not provide Plaintiffs with any documentation or court order indicating why J.M. should be, or was being, removed from their home.

31.     DEGRANGE told Plaintiffs that she was taking J.M. from their home to his "father's" house because his "father" "wanted him." DEGRANGE informed Plaintiffs that J.M.'s father was an individual named Thaddeus Wilkins ("WILKINS").

32.     Prior to J.M.'s mother's death, WILKINS had been introduced to J.M. a handful of times.

33.     As of May 2, 2023, WILKINS: had never had custody of J.M.; was not identified on J.M.'s birth certificate as J.M.'s father; had not executed a VAP; had not undergone any paternity test demonstrating that he was J.M.'s biological father; and had never served as J.M.'s caregiver.

34.     WILKINS is not J.M.'s father, biological or otherwise.

35.     On May 2, 2023, WILKINS was a stranger to J.M. Because J.M. was just two-years old, and had only previously met WILKINS a handful of times in his short life, he did not know WILKINS.

36.     On May 2, 2023, prior to DEGRANGE removing J.M. from Plaintiffs' custody and care, Plaintiffs presented DEGRANGE with the Parental Consents J.M.'s mother executed prior to her unexpected and untimely death, demonstrating that Plaintiffs had been granted short-term guardianship over J.M. from the time he was four-months old through that date and beyond, through January 2024.

37. Despite all evidence demonstrating that it was J.M.'s mother's intent and it was in J.M.'s best interest for J.M. to remain with Plaintiffs, his guardians since he was four-months-old, DEGRANGE removed J.M. from Plaintiffs' loving and caring home to WILKINS – with no evidence regarding J.M.'s paternity and no evidence that WILKINS was J.M.'s father, biological or otherwise.

38. The emotional, mental, and physical damages to J.M. as a result of DEGRANGE's forcible removal were swift and clear.

39. On or about May 3, 2023, WILKINS relayed to KATHERINE that J.M. had retreated within himself, becoming silent and staring into space much of the time. WILKINS asked KATHERINE if this was normal for J.M. – it was not.

40. On information and belief, WILKINS was not prepared to care for or provide for J.M.'s declining emotional and mental health, nor was he prepared to care for J.M.'s medical conditions, nor ensure J.M.'s various and evolving emotional, mental and medical needs were met.

41. Most disturbingly, WILKINS' home was not fit to house or care for any two-year-old child, much less one with special and specific medical needs.

42. On information and belief, DEGRANGE took no actions or steps, or performed any investigation as to whether J.M.'s placement with WILKINS was safe, appropriate, or in J.M.'s interest, let alone his best interests.

43. On May 9, 2023, KATHERINE emailed Defendants DEGRANGE and CARSWELL, and Defendant JONES, respectively, inquiring as to how J.M. could have been taken from Plaintiffs and moved to WILKINS when Plaintiffs had short-term guardianship of J.M., and WILKINS was not on J.M.'s birth certificate; had not executed a VAP; and was a stranger to J.M. KATHERINE also raised concerns regarding J.M.'s emotional wellbeing and the environment at

WILKINS' home. She received no response.

44. On May 10, 2023, Plaintiffs visited J.M. at WILKINS' home and viewed the environment in which J.M. and WILKINS were living. It was after this visit that their concerns for J.M.'s health and welfare increased exponentially. Accordingly, Plaintiffs took a number of actions to attempt to regain custody of J.M. and/or verify that there was somehow evidence that WILKINS was, in fact, J.M.'s father, including, emailing the general DCFS email address, and submitting an online report to the DCFS Child Abuse/Neglect Hotline, wherein they expressed their wishes to remain J.M.'s guardians and caregivers, as there was no evidence that WILKINS was J.M.'s father or that he had any relationship to or with J.M.

45. On information and belief, despite being contacted by Plaintiffs via three different mediums, only an "informational" intake report was created by DCFS on May 10, 2023. No formal investigation was opened.

46. On May 12, 2023, after receiving no response from DEGRANGE, CARSWELL or JONES, KATHERINE sent an email to Defendant LEGGIN, again expressing concern for J.M.'s health and wellbeing, and requesting that someone respond to Plaintiffs' multiple requests, across multiple mediums, for assistance.

47. Plaintiffs never received a response to any of the questions or concerns they voiced, either orally or in writing.

48. From May 2, 2023 to February 2024, Plaintiffs continued to attempt to see J.M. by contacting WILKINS directly, but WILKINS only permitted Plaintiffs to visit with J.M. on eleven (11) occasions.

49. In November 2023, WILKINS allowed Plaintiffs to visit J.M. at WILKINS' home. Prior to this visit, KATHERINE had been receiving numerous notifications from the pharmacy

which filled J.M.'s prescriptions, notifying her that J.M.'s prescriptions were not being picked up and refilled. During this visit, Plaintiffs noticed that J.M. had filled prescription bottles which should have been empty or, at the very least, significantly depleted – thus confirming that J.M. was not receiving his required daily doses of medication for his serious medical condition

50.     Also, during this November 2023 visit, Plaintiffs discovered an abrasion on J.M.'s torso.

51.     Immediately following this November 2023 visit with J.M., Plaintiffs made a call to the DCFS hotline to report that J.M. was being physically abused and medically neglected.

52.      DCFS initiated an investigation after receiving Plaintiffs' November 2023 hotline call. However, this investigation was falsely and wrongly classified as "unfounded."

*WILKINS Abandons J.M., Revealing He Is Not, and Never Was, J.M.'s Father, and Returns J.M. to Plaintiffs*

53.      On February 9, 2024, after not hearing from WILKINS since November 2023, Plaintiffs receive a phone call from WILKINS, wherein he indicated that he "finally" found out that he was **NOT** J.M.'s biological father and, as a result, he no longer "wanted" now-three-year-old J.M.

54.     WILKINS requested that Plaintiffs meet him that same day. Deeply concerned for J.M.'s welfare, Plaintiffs agreed.

55.     WILKINS met Plaintiffs on the side of a road, where WILKINS handed them a bag with J.M.'s belongings, told Plaintiffs that he was not J.M.'s father, and asked Plaintiffs to take custody of J.M. "forever." Plaintiffs agreed. Inexplicably, J.M. had a black eye at the time the Plaintiffs picked him up.

56.      On February 11, 2024, Plaintiffs filed an Emergency Petition for Co-Guardianship of J.M.

57. On February 13, 2024, the Circuit Court of Cook County granted Plaintiffs custody of J.M. until further order of the court.

58. On October 3, 2025, the Circuit Court of Cook County granted the Bond of Guardianship to Plaintiffs, and on April 21, 2026, Plaintiffs legally adopted J.M.

59. From February 9, 2024 to date, Plaintiffs have maintained full and exclusive custody of J.M., holding all decision-making authority, including educational decisions, health-related decisions, extracurricular decisions, and safety decisions.

## DAMAGES

60. On May 2, 2023, then-two-year-old J.M. was just two (2) weeks past the trauma of his mother dying in front of him, and having had to survive on his own for seven (7) days before he and his mother's body were discovered.

61. On May 2, 2023, DEGRANGE forcibly removed two-year-old J.M. from Plaintiffs' home without a hearing or court order, as required under Illinois law, and placed J.M. with WILKINS, a man who was not his father and was, in fact, a stranger to J.M.

62. As of May 2, 2023, Plaintiffs had cared for then-two-year-old J.M. at their home every weekend since he was four-months-old, as well as caring for him when his mother had an emergency or needed assistance.

63. As of May 2, 2023, Plaintiffs were the most familiar, stable, and caring environment available and known to J.M., and were the only individuals, other than his mother, who ever had guardianship and custody over J.M.

64. DEGRANGE's wrongful and forcible removal of J.M. from Plaintiffs' custody and familiar and loving home, and placement of J.M. with a third-party stranger, WILKINS, caused J.M. to endure and suffer immense and unnecessary stress and emotional trauma, above and

9

beyond what he had already endured having witnessed his mother die in front of him, and having had to survive for a full week on his own as a two-year-old.

65. Further, J.M. endured and suffered injuries in the forms of mental distress and physical trauma as a result of his unvetted, unverified, unsafe and inappropriate placement with WILKINS.

66. On information and belief, J.M. was without his medically-necessary daily prescription medication for approximately six (6) of the nine (9) months he lived with WILKINS. Moreover, J.M. was forced to live in unsanitary, unsafe, abusive and neglectful conditions.

67. J.M. was not provided any recommended therapy, including but not limited to speech therapy or occupational therapy, for approximately six (6) of the nine (9) months he lived with WILKINS.

68. J.M. has suffered developmental delays; emotional, mental and physical distress; emotional, mental and physical injuries; and trauma that will negatively impact and affect him for the rest of his life as a result of Defendants:

      a. removing J.M. from Plaintiffs' home and custody;

      b. failing to determine if placement with WILKINS was proper and safe, and/or in J.M.'s best interests prior to his removal from Plaintiffs;

      c. placing J.M. with WILKINS despite WILKINS not being his father, biological or otherwise, and having no evidence of paternity;

      d. placing J.M. with WILKINS despite WILKINS not being a family member or fictive kin of J.M.;

      e. placing J.M. with WILKINS despite WILKINS not being a licensed foster parent;

      f. placing J.M. with WILKINS without properly vetting WILKINS and his home to ensure they were safe, appropriate, and in J.M.'s best interests; and

      g. keeping J.M. placed with WILKINS for nine (9) months, despite Plaintiffs'

10

outcries, reports, and warnings.

69. All of these events, damages, harm and distress would not have occurred had Defendants: not removed J.M. without probable cause; taken any steps, conducted proper investigations, and/or evaluated whether removal of J.M. was warranted; taken any steps, conducted proper investigations, and/or evaluated whether J.M.'s placement with WILKINS was appropriate and safe; conducted proper investigations, and/or evaluated whether J.M.'s removal from Plaintiffs and placement with WILKINS was in J.M.'s best interests. Further, none of the aforementioned events, damages, harm and distress would have occurred had Defendants ensured, vetted and/or investigated WILKINS' paternity and lack of relationship to J.M., prior to removing J.M. from Plaintiffs' loving home and custody.

**COUNT I**
**Fourth Amendment – Unlawful Seizure of J.M.**
*Plaintiffs KATHERINE MUIRHEAD and CAMERON MUIRHEAD,*
*as next best friends of J.M., a minor, v. All Defendants*

70. Each preceding Paragraph of this Complaint is incorporated as though fully restated herein.

71. The Parental Consents executed by J.M.'s mother, appointing Plaintiffs as J.M.'s short-term legal guardians from the time he was four-months-old through January 2024, gave Plaintiffs a legitimate expectation of privacy over their custody of J.M. and in having, caring for, and keeping J.M. in their custody and home.

72. Upon J.M.'s mother's death, Plaintiffs were J.M.'s sole guardians and caregivers.

73. On May 2, 2023, DEGRANGE unlawfully seized J.M. without a court order, exigent circumstances, or any explanation, documentation or justification for her seizure of J.M.

74. At the time of J.M.'s seizure, there was no probable cause for J.M.'s removal, or to believe that any of the criteria justifying emergency removal of J.W existed.

11

75. DEGRANGE seized J.M. from Plaintiffs without an approved petition from a court granting her the authority to remove J.M. from Plaintiffs' custody and care.

76. Plaintiffs did not abuse or neglect J.M., nor was he in any danger, immediate or otherwise, while in Plaintiffs' custody and care.

77. DEGRANGE did not have evidence nor any reason to believe that Plaintiffs abused or neglected J.M., nor that he was in any danger, immediate or otherwise.

78. At no time did DEGRANGE have evidence or reason to believe that WILKINS was J.M.'s father: WILKINS was and is not on J.M.'s birth certificate; there was and is no VAP; and there was and is no court order establishing paternity.

79. The lack of any of these three (3) pieces of evidence makes J.M.'s seizure and placement with WILKINS not only unreasonable, but unlawful.

80. J.M.'s mother's Parental Consents, appointing Plaintiffs as J.M.'s guardians whenever she was unable to care for J.M. herself, are evidence that her wishes were for Plaintiffs to care for and maintain custody of J.M.

81. DEGRANGE did not have evidence or probable cause to believe that it was in the best interests of J.M. to remove him from Plaintiffs' home to WILKINS' home, as outlined above.

82. WILKINS' February 9, 2024 abandonment of J.M. on the side of a road, with a black eye, further demonstrates that DEGRANGE had no basis to believe WILKINS was J.M.'s father, or that J.M.'s best interests were being served when he was removed from Plaintiffs and placed with WILKINS, a stranger.

83. On information and belief, at the time that DEGRANGE removed J.M. from Plaintiffs' home, her supervisor, CARSWELL, approved such removal.

84. Plaintiffs were never a threat to J.M., and no allegations of abuse and neglect were

ever lodged against Plaintiffs that would warrant J.M.'s removal, much less emergency removal.

85. Thus, J.M. was wrongfully, unlawfully removed from Plaintiffs' custody and home at the direction and hands of DEGRANGE, with the approval of CARSWELL.

86. JONES and LEGGIN were supervisors with authority over DEGRANGE and CARSWELL, and had direct knowledge of J.M.'s unreasonable and illegal seizure, removal and placement, yet did nothing to determine the legality of the seizure, removal, or placement, or to return J.M. to the only place and people he knew as home, outside of his mother's custody and care, and the only place that was in his best interests following her death – Plaintiffs' home – further condoning the wrongful, unlawful seizure.

87. As a direct and proximate result of Defendants' misconduct described in this Count, J.M. suffered the loss of: love; nutrition; physical, emotional and cognitive development; and the medical attention he required due to his underlying medical conditions; in addition to suffering from continued injuries and damages.

### COUNT II
**Fourteenth Amendment – Violation of Substantive and Procedural Due Process**
*Plaintiffs KATHERINE MUIRHEAD and CAMERON MUIRHEAD,*
*as next best friends of J.M., a minor, v. All Defendants*

88. Each preceding Paragraph of this Complaint is incorporated as though restated fully herein.

89. On May 2, 2023, J.M. had a protected liberty interest in his familial relations, which in his case was with his guardians and caregivers, Plaintiffs. J.M. had the right to be cared for, nurtured and raised by Plaintiffs without interference by and from Defendants.

90. J.M.'s liberty interest was infringed upon following his unlawful seizure from Plaintiffs on May 2, 2023.

91. J.M.'s liberty interest continued to be infringed upon for the duration of his

detainment with WILKINS, away from Plaintiffs, for over nine (9) months as a result of Defendants' misconduct and wrongful, unlawful acts and omissions.

92. Following the tragic and untimely death of J.M.'s biological mother and his subsequent placement with his guardians and caregivers, Plaintiffs, there were no grounds to suspect that J.M. was in danger of, or facing the threat of, abuse or neglect if he remained with Plaintiffs.

93. There have never been any allegations of abuse or neglect against Plaintiffs, at any time, suggesting or otherwise implying that J.M. faced an imminent threat of harm in Plaintiffs' custody and care.

94. Instead, late one night, without warning, J.M. was forcibly ripped from the only stable guardians, other than his mother, he had known since birth, on the false pretense that he was being placed with his biological father.

95. At no point in time was a pre-deprivation hearing, post-deprivation hearing, or any hearing at all, conducted to ensure J.M.'s interests were even considered.

96. Defendants did not vet or otherwise investigate whether WILKINS was, in fact, J.M.'s father. Nor did they inspect, vet or otherwise investigate and determine that placement with WILKINS in WILKINS' home was safe, appropriate, and in the best interests of J.M.

97. As a result of seemingly zero investigation, no legal process, and no exigent circumstances, J.M. and his best interests were not only denied the opportunity to be heard in any meaningful way, but J.M. was denied the ability live safe from harm and trauma with Plaintiffs, free from unlawful interference by Defendants.

98. As a result of Defendants' misconduct and wrongful, unlawful acts and omissions, J.M. was kept from Plaintiffs, his loving and caring guardians – and now parents – for over nine

(9) months and forced to live with WILKINS, someone who was not his father, biological or otherwise, nor was WILKINS a family member, fictive kin, or foster parents, in an unfamiliar and unsafe environment, where his special and specific medical, emotional and physical needs were not met.

99.     Therefore, as a direct and proximate result of Defendants' misconduct described in this Count and in the preceding Paragraphs, J.M. was forced to be separated from the Plaintiffs and accordingly suffered the loss of: love; nutrition; physical, emotional and cognitive development; and the medical attention he required; in addition to suffering from continued injuries and damages as set forth above and herein.

## COUNT III
### Negligence
*Plaintiffs KATHERINE MUIRHEAD and CAMERON MUIRHEAD, as next best friends of J.M., a minor, v. Defendant DEGRANGE*

100.    Each preceding Paragraph of this Complaint is incorporated as though restated fully herein.

101.    At all material and relevant times, DEGRANGE, a Child Protection Specialist, owed a duty of care to J.M. to act as ordinary careful Child Protection Specialists, using the same degree of knowledge, skill and ability as ordinarily careful Child Protections Specialists would exercise under similar circumstances.

102.    At all material and relevant times, DEGRANGE, as a Child Protection Specialist owed a duty of care to J.M.

103.    Defendant DEGRANGE individually (as set forth below) and collectively breached these duties in the following ways:

      a.      DEGRANGE unlawfully seized of J.M. in direct contravention of the law, statutory authority and DCFS regulations;

15

b.  DEGRANGE unlawfully seized J.M. from Plaintiffs' custody and home without any documentation or court order justifying, explaining, or ordering the removal as required by law;

c.  DEGRANGE unlawfully seized J.M. from Plaintiffs' custody and home when she was unauthorized to do so, as she was a child protection specialist, not an investigator;

d.  DEGRANGE unlawfully seized J.M. from Plaintiffs' custody and home without the existence of any criteria, or probable cause, justifying his emergency removal. To wit: 1) there was no approved petition from a court or court order finding that Defendants had any authority over J.M., granted by DCFS Placement and Visitation Services Regulations, Section 301.40 – Legal Authority to Place; 2) there was no reason to believe that Plaintiffs abused or neglected J.M., or that he was in any danger, immediate or otherwise, according to DCFS Placement and Visitation Services Regulations, Section 301.50 – Emergency Placement.

e.  DEGRANGE unlawfully seized J.M. from Plaintiffs' custody and home with no certainty to believe that WILKINS was J.M.'s father because: WILKINS was and is not on J.M.'s birth certificate; there was and is no VAP; and there was and is no court order of paternity;

f.  DEGRANGE unlawfully seized J.M. from Plaintiffs' custody and home and unlawfully placed J.M. with WILKINS despite knowing that WILKINS was not J.M.'s family or fictive kin, and knowing that WILKINS was not a licensed foster parent;

g.  DEGRANGE unlawfully seized J.M. from Plaintiffs' custody and home without probable cause to believe that it was in the best interests of J.M. to remove him from their home, which checked every box of Section 301.60(b) Placement Selection Criteria, into WILIKINS' home, which checked none;

h.  DEGRANGE seized J.M. from Plaintiffs' custody and home without probable cause to believe that J.M. was in any immediate danger;

i.  Following DEGRANGE's illegal seizure of J.M. from Plaintiffs' custody and home, Plaintiffs were not provided a hearing on the emergency removal of J.M. within forty-eight (48) hours, or at any time;

j.  Following DEGRANGE's illegal seizure of J.M. from Plaintiffs' custody and home, no action was taken to determine the legality of J.M.'s placement with WILKINS, or to return J.M. to the place that was in his best interests.

104.  As a direct and proximate result of DEGRANGE's misconduct described in this

Count, J.M. suffered the loss of: love; nutrition; physical, emotional and cognitive development; and the medical attention he required; in addition to suffering from continued injuries and damages as set forth above and herein.

**COUNT IV**
**Negligence**
*Plaintiffs KATHERINE MUIRHEAD and CAMERON MUIRHEAD, as next best friends*
*of J.M., a minor, v. All Defendants*

105.     Each preceding Paragraph of this Complaint is incorporated as though restated fully herein.

106.     At all material and relevant times, Defendants, as child welfare social workers and Child Protection Specialists, or Public Service Administrators, owed a duty of care to J.M. to act as ordinary careful child welfare workers, Child Protection Specialists or Public Service Administrators, using the same degree of knowledge, skill and ability as ordinarily careful child welfare social workers, Child Protections Specialists or Public Service Administrators would exercise under similar circumstances.

107.     At all material and relevant times, Defendants, as child welfare social workers, Child Protection Specialists or Public Service Administrators, owed a duty of care to J.M.

108.     Defendants individually (as set forth below) and collectively breached these duties in the following ways:

    a.    Defendants approved, condoned and/or otherwise allowed DEGRANGE's seizure to take place, in violation of law, statutory authority, and DCFS regulations;

    b.    Following DEGRANGE's illegal seizure of J.M. from Plaintiffs' custody and home, no Defendant ensured or otherwise provided Plaintiffs with a hearing on the emergency removal of J.M. within forty-eight (48) hours, or at any time;

    c.    Following DEGRANGE's illegal seizure of J.M. from Plaintiffs' custody and home, no Defendant took any action or did anything to determine the

legality of J.M.'s placement with WILKINS, or to return J.M. to the place that was in his best interests.

109. As a direct and proximate result of Defendants' misconduct described in this Count, J.M. suffered the loss of: love; nutrition; physical, emotional and cognitive development; and the medical attention he required; in addition to suffering from continued injuries and damages as set forth above and herein.

**COUNT V**
**Intentional Infliction of Emotional Distress**
*Plaintiffs KATHERINE MUIRHEAD and CAMERON MUIRHEAD, as next best friends*
*of J.M., a minor, v. All Defendants*

110. Each preceding Paragraph of this Complaint is incorporated as though fully restated herein.

111. The aforementioned acts and omissions by Defendants were extreme and outrageous.

112. Defendants recklessly and/or consciously disregarded the probability of causing severe emotional distress to J.M., then a two-year-old who had just spent a week alone with his mother's dead body, when they traumatically and dramatically removed and/or approved and allowed J.M.'s removal from the one family's home he knew outside his own, which he considered a second home.

113. Defendants recklessly and/or consciously disregarded the probability of causing severe emotional distress to J.M. by failing to properly ensure that placement with WILKINS – a stranger – who abused and neglected J.M. and was utterly unable to meet his needs – was proper.

114. Devastatingly, Defendants continued to recklessly and/or consciously disregard the probability of causing severe emotional distress to J.M. by refusing to take any action to redress their aforementioned actions.

115.     As a direct and proximate results of one or more of the aforementioned acts and omissions by Defendants, J.M. suffered and will continue to suffer severe emotional and mental distress, and J.M. has incurred and will continue to incur medical expenses for his emotional and mental wellbeing, as a result of the injuries sustained.

WHEREFORE, Plaintiffs KATHERINE MUIRHEAD and CAMERON MUIRHEAD, as next best friends of J.M., a minor, ask that judgment be entered in J.M.'s favor against all Defendants, in an amount that is fair and just, for costs as provided by law, and for any other relief this Court deems proper.

## PLAINTIFFS DEMAND TRIAL BY JURY

Dated:   July 8, 2026                    /s/ Allyson L. West
                                         One of the Attorneys for Plaintiffs

Kelly M. Olivier (kolivier@halemonico.com)
Jaclyn Fortini (jacifortini@halemonico.com)
Allyson L. West (awest@halemonico.com)
Attorneys for Plaintiffs
Hale Law, LLC
Themis: Trial by Women of Hale Law, LLC
53 W. Jackson Blvd., Suite 334
Chicago, IL 60604
(312) 341-9646
*Attorneys for Plaintiffs*

19